1
2
3
4
5
6
7
8               **UNITED STATES DISTRICT COURT**

9               **EASTERN DISTRICT OF CALIFORNIA**

10

| | | |
|---|---|---|
| 11 | GURPREET SIDHU, | ) Case No.: 1:19-cv-01020-JLT |
| 12 | Plaintiff, | ) |
| | | ) ORDER DENYING DEFENDANTS' MOTION |
| 13 | v. | ) FOR SUMMARY JUDGMENT |
| | | ) |
| 14 | STATE OF CALIFORNIA, DEPARTMENT | ) (Doc. 18) |
| 15 | OF CORRECTIONS AND REHABILITATION, et al., | ) |
| 16 | Defendants. | ) |
| 17 | | ) |

18          Plaintiff is a female staff dentist at Wasco State Prison. She raises claims of gender

19    discrimination and retaliation against the California Department of Corrections and Rehabilitation and

20    supervising dentist Dr. Hani Guirguis. Plaintiff claims that Dr. Guirguis engaged in a series of

21    discriminatory acts based on her gender: imposing reporting requirements and administrative

22    procedures on her that were not required of other male dentists, choosing male dentists instead of her

23    to attend a training session at CDCR headquarters, making derogatory comments about women, and

24    refusing to move her to a different location at Wasco allegedly in retaliation for filing an

25    administrative complaint with the Department of Fair Employment and Housing.

26          Defendants' motion is made on the grounds that there is no genuine dispute of material facts in

27    connection with Plaintiff's claims under 42 U.S.C. § 1983 and under California's Fair Employment

28    and Housing Act (California Government Code section 12940 *et seq.*). Alternatively, Defendants

move for partial summary judgment on specific issues, claims, and affirmative defenses.[1] Because there are genuine disputes of material facts, the motion for summary judgment/summary adjudication is **DENIED**.

## I.      Background and Undisputed Material Facts[2]

### A.      Introductory Facts

Plaintiff has been a dentist at Wasco State Prison for almost 13 years, apart from a brief assignment to Solano State Prison between 2015 and 2016. (UMF 1.) Dr. Hani Guirguis is the supervising dentist at Wasco and has been since 2011. (UMF 6.) The plaintiff claims she suffered adverse employment actions imposed by Dr. Guirguis, which were motivated by gender discrimination, including: being forced to report her movements throughout the day; being denied more favorable training; being forced to comply with a computer password policy that was not enforced against her male colleagues; being denied a move to a different work location at the prison and, instead, having to work at a more demanding location; and, being subjected to a hostile work environment caused by Dr. Guirguis making derogatory comments about women.

### B.      The Reporting Requirement

In May 2017, Plaintiff left her work area for a meeting. (UMF 8.) Later that day, Dr. Guirguis emailed Plaintiff saying "Dr. Sidhu, please let me know when you leave your work area for accountability. I saw you in the parking lot today and did not know you had left the clinic." (UMF 9.) The plaintiff asserts that though she had been employed by the CDCR for ten years before this date, she had never been told about this policy, and she had never before been required to comply with it. (Sidhu Decl. ¶ 6)

---

[1] Defendants filed a notice of errata regarding the declaration of (1) Dr. Hani Guirguis, (2) Dr. Matthew Milnes, and (3) Dr. Jae Jang, noting that the unsigned versions of these declarations were inadvertently filed, rather than the version with the executed signature pages. (Doc. 21.) Defendants concurrently re-filed the signed versions (Docs. 22, 23, 24), "exactly as they were filed previously but with signature" (Doc. 21 at 2). The Court acknowledges this error and has referenced the signed versions of the declarations as applicable.

[2] This section is a summary of both the undisputed facts and the parties' positions in this action. Defendants filed a "Separate Statement of Undisputed Facts" in support of the motion. (Doc. 18-2.) The Court will refer to the undisputed material facts in this statement as "UMF." Plaintiff filed a response to Defendants' statement of undisputed facts, admitting and denying the facts submitted by Defendants. (Doc. 20-7.) To the extent any facts identified by the Defendants are disputed **and the Court found the evidence cited supports the facts identified**, the Court has directly cited the evidence in its analysis. Likewise, to the extent the evidence cited by Plaintiff in his opposition is not disputed by the defendants' evidence, the Court has directly cited the evidence in its analysis.

The plaintiff claims also that Dr. Guirguis applies the reporting requirement only to the female dentists and not to the male dentists. (Doc. 20 at 11.) Plaintiff alleges that Dr. Guirguis expressly told her that the reporting requirement only applied to women. (UMF 14; Doc. 20 at 11.) Dr. Guirguis then mockingly pointed to Dr. Nguyen (a male dentist) and said, "I'm not worried about this guy." (Sidhu Decl. ¶ 6) Plaintiff never saw or heard the male dentists at Wasco emailing or calling Dr. Guirguis to inform him they were leaving their clinics. (UMF 11.) Plaintiff also reports that on one occasion she observed Dr. Guirguis being surprised by a male doctor, Dr. Robert Seitz, arriving at a meeting (UMF 17), leading her to believe that Dr. Seitz had not let Dr. Guirguis know that he had left his duty station.

Unlike her colleagues, Plaintiff must leave her work area up to five times per day. (Sidhu Decl. ¶ 6.) Thus, the reporting requirement made her report 20 times per week when she left her work area, and it placed a burden on her that her male colleagues did not bear. (Sidhu Decl. ¶ 6.) Because Dr. Guirguis was explicit that the policy was imposed on the women only, Plaintiff reported this to her union and prison EEO officer, which resulted in a meeting that took place in May 2017. (Sidhu Decl. ¶ 6.) Present at that meeting were Mr. Guirguis, Lisa Lewis (Plaintiff's union representative), Dr. Rahman, and Fred Faughn. (UMF 25; Sidhu Decl. ¶ 6.) At that meeting, Dr. Guirguis asked Plaintiff if "she needed to see a shrink" because she is a female and females are more vulnerable. (Doc. 20 at 6; Rahman Depo. 12:9-25; Lewis Decl. ¶ 2.) Additionally, at that meeting, Dr. Guirguis reiterated that the rule only applied to the female dentists. (Sidhu Decl. ¶ 6.)

### C.    The Training Denial

Plaintiff alleges that she was denied the opportunity to attend a training seminar in Sacramento in August 2017. (Doc. 20 at 16.) This CERNR data-management training was designed to train "super-users." (UMF 34.) Plaintiff found out about this training when she learned that Dr. Seitz and Dr. Jang, both male dentists, had been selected to attend it. (UMF 36.) Plaintiff knew that high level agency personnel would be present at the training, so it would also provide a significant networking opportunity. (Sidhu Decl. ¶ 7.) Plaintiff felt the networking opportunities could help her when applying for supervisory positions. Id.

A similar CERNR training was offered to other dentists later in the year, and Plaintiff was able to attend it. (UMF 42.) However, aside from the networking opportunities the initial training provided,

the "super-user" training was superior because the two individuals who took that training become the trainers and leaders for the other dentists when they had questions about the computer program. (Sidhu Decl. ¶ 7.) Such super-users have the authority and ability to continue teaching other dentists about the program, which is important for a dentist who wants to apply for a promotion. (Sidhu Decl. ¶ 7.) Plaintiff asserts that at least ten times she has applied for promotions and five times she has received interviews, but she has not been hired. (Sidhu Decl. ¶ 7) Nevertheless, she has always been given good work evaluations and never received any written reprimands or warnings.  (Sidhu Decl. ¶ 8) Rather, he has received compliments from supervisors about her work and was provided recommendation letter from two. Id.

Plaintiff observed that the application always asks questions about whether she has training or supervisory experience. (Sidhu Decl. ¶ 7.) The super-user CERNR training would have been one opportunity for her to enhance her resume for potential promotions. (Sidhu Decl. ¶ 7.) Plaintiff further reports that there have been other training seminars for dentists from her office to attend, including other computer training, which occurred in 2017 and 2018, but she was never chosen to attend any and only male dentists were chosen. (Sidhu Decl. ¶ 7.)

### D.   The X-Ray Procedures

In September 2017, Dr. Guirguis implemented a new procedure for reviewing X-rays, which was imposed on Plaintiff alone. (Doc. 20 at 19) The old procedure required the dental assistant to log in using the assistant's login and password. (Doc. 20 at 19.) The dental assistant would then take the X-rays and have them available on the computer screen for review by the dentist (still using the dental assistant's login). (Sidhu Decl. ¶ 9) Next, the X-rays would be downloaded to a permanent file (still using the dental assistant's login). (Doc. 20 at 19.) The old procedure allowed the dentist to view and manipulate the X-rays, meaning increasing or decreasing the density of the X-ray for contrast, to see the image better before it was saved. (Sidhu Decl. ¶ 9) Once it was saved, no further manipulation could be done. Id.

The new procedure required Dr. Sidhu to return to her office computer to review the images before they were saved to make sure no manipulation was needed. (Sidhu Decl. ¶ 9) If an image could not be enhanced sufficiently for viewing, Plaintiff would then return to the dental hygienist and require

a new image be taken. Id. Again, rather than allowing her to view the image as it was created on the hygienist's computer, Plaintiff would again have to return to her office computer to view the image to confirm its readability. Id. Each time she had to return to her computer, she was required to log in to her computer and enter the patient's nine-digit personal identification number. Id. Once a good image was captured, Plaintiff would return to the operatory computer, log in again, and continue her treatment of the patient. Id. X-rays were taken five to six times per day, so the new procedure caused an inordinate waste of Plaintiff's time. With the number of patients involved, it created a strain on Plaintiff's schedule and made her need to rush her work, all of which impaired her ability to perform her job. (Doc. 20 at 20; Sidhu Decl. ¶ 9.)

Plaintiff's reports that the new procedure was detailed in an email, but it was not copied to the other dentists. (UMF 70.) Moreover, the new procedure was not imposed on the other dentists. (Doc. 20 at 20; Sidhu Decl. ¶ 9.) Dr. Guirguis admitted he has no specific recollection of sending an e-mail outlining the procedure to the other dentists or discussing it at a meeting. (Doc. 20 at 20; Guirguis Depo. 70:15-72:18.) Indeed, Dr. Davis admitted that he used the prior X-ray procedure, which allowed him to view X-rays using the technician or assistant's login. (Doc. 20 at 20.) The more burdensome procedure was intended only for Plaintiff and was not required for all dentists. (Doc. 20 at 20-21; Sidhu Depo. ¶ 9.)

E.    The Location Refusal

In May or June of 2017, Plaintiff made a request to be reassigned to B Yard permanently, where she had been working while Dr. Inas Michael was on a long-term leave. (Doc. 20 at 22; Sidhu Decl. ¶ 10.). (Doc. 20 at 22; Sidhu Decl. ¶ 10.) Plaintiff made the written request to union representative, Lisa Lewis, also. (Sidhu Decl. ¶ 10; Doc. 20-4 at 2.) Dr. Guirguis said he would consider the request but stated that because Dr. Michael might return from leave, he could not place her on B Yard permanently at that time. (Doc. 20 at 22; Sidhu Decl. ¶ 10.) In July 2017, Ms. Wallace, a dental assistant who was known to be difficult to work with, was assigned to B Yard. (Doc. 20 at 22; Sidhu Decl. ¶ 10.) Substantial friction occurred between Plaintiff and Ms. Wallace, and Plaintiff requested that something be done so she would not be required to work with Ms. Wallace. (Doc. 20 at 22; Sidhu Decl. ¶ 10.) Rather than address Ms. Wallace's conduct, Dr. Guirguis moved Plaintiff to A

Yard in about September 2017, which is the most difficult assignment at the prison.  (Sidhu Decl. ¶ 10.  It has a much higher volume of work and includes all types of dental procedures, while other yards allow only emergency extractions.  (Doc. 20 at 22-23; Sidhu Decl. ¶ 10.) Also, A Yard is where the least experienced assistants are assigned, which required Plaintiff to train the staff in addition to keeping up with the large volume of work. (Sidhu Decl. ¶ 10) Routinely, the volume of work on A Yard, required Plaintiff to work two to three hours longer than the dentists assigned to the other Yards. Id. In the past, when male doctors had problems with Ms. Wallace, Dr. Guirguis would move Ms. Wallace, not the doctor. Id.

Plaintiff again requested to be transferred to B Yard in June 2018. (UMF 73.) Prior to this request, Plaintiff discovered that Dr. Michael had retired at some point in the past. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) Though Dr. Guirguis knew of the retirement, he did not inform Plaintiff of this fact. Id. By this time also, Ms. Wallace was no longer working in B Yard. Id. Nevertheless, Dr. Guirguis denied this request because he had placed a new male dentist, Dr. Hoang, in that position. Id.

Plaintiff filed a grievance in September 2018, which was answered by the CEO, Mr. Hill. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) Mr. Hill informed Plaintiff that, "There currently is a dentist already working in that yard. However, if a vacancy should arise in the future and you submit a request to move into the vacant yard, your request will be considered." (UMF 77.) However, Mr. Hill only responded to the grievance and did not make the decision whether to place Plaintiff in B Yard. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) Dr. Guirguis made that decision. Id.

In October 2020, Dr. Guirguis was replaced by an acting supervisor who is female, Dr. Melissa Primus. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) When Plaintiff asked Dr. Primus to transfer, Dr. Primus moved Plaintiff to B Yard in October 2020, bumping the less senior employee, Dr. Hoang. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) Before this happened, Dr. Guirguis had informed Plaintiff that she could not bump someone with less seniority and that she had to wait for a vacancy to occur. (Doc. 20 at 23; Sidhu Decl. ¶ 10.)

### F.   Noting "Unfavorable Surgical Outcomes"

Plaintiff includes other incidents and conduct by Dr. Guirguis as background for her claims of discrimination against females. (Doc. 18-1 at 13-14.) For instance, when a new female oral surgery

6

contractor, Dr. Olena Norris, began providing services, Dr. Guirguis instructed dentists to note any "unfavorable surgical outcomes" (UMF 84) on an excel spreadsheet, for use in canceling her contract (Doc. 18-1 at 14; Complaint ¶ 11(A)). Plaintiff found the requirement that they create the spreadsheet for only one oral surgeon—a female—to be discriminatory. (Sidhu Depo. 43:25-44:15.) Plaintiff believes that Dr. Guirguis was attempting to get the female oral surgeon fired, so that one he preferred could be hired. (Doc. 18-1 at 14; Sidhu Depo. 30:1-13; 40:5-24.)

**G.      Dr. Guirguis Did Not Permit Female Dentists to Serve as Acting Supervisor**

Dr. Guirguis never appointed Plaintiff as the acting supervisor in his absence. (Sidhu Dec. ¶ 11) Before Dr. Guirguis became the supervisor, Dr. Michaels would be the acting supervisor.  Id. After Dr. Guirguis became the supervisor, he phased out appointing Dr. Michaels and only appointed the male doctors to take on the role, even those with less seniority. Id. Though Dr. Guirguis said he did this because he thought the others had more experience, he never bothered to learn of the full extent of Plaintiff's experience. Id.

**H.      Discriminatory Comments**

Plaintiff claims that Dr. Guirguis has a long history of inappropriate comments, which Plaintiff claims creates a hostile work environment. For example, Plaintiff alleges that Dr. Rynders was feeling hot, and Dr. Guirguis said to Dr. Rynders (a male dentist), "Are you going through menopause." (UMF 131.) Plaintiff claims Dr. Guirguis "kinda looked towards our direction, and then he said – he said, 'Right? You would understand that, right?'" (Sidhu Depo. 108: 19-24.) Plaintiff took that to mean Dr. Guirguis was saying she was going through menopause. (UMF 133.)

In 2012, Dr. Guirguis (who is from Egypt) said when discussing a female dentist, "If she doesn't want to come to work I can't drag her by her hair and bring her to work. This is not Egypt." (Doc. 18-1 at 17; Sidhu Depo. 182:3-24; UMF 137.) In another instance, when discussing the retirement of Dr. Aziz, a female dentist who had resigned, Dr. Guirguis stated that "women with husbands making good money should not work." (Doc. 18-1 at 18; Sidhu Depo. 186: 6-24.) Dr. Guirguis had been in contact with Dr. Aziz and said that "she was now happy . . . she takes care of herself, and she—you know, I always see her with makeup, and she's doing good." (Sidhu Depo. 186:25-187:3.)

In 2016 or 2017, it was reported to Plaintiff that Dr. Guirguis compared the physiques of women. (UMF 147.) Plaintiff heard that "he's just comparing their physiques . . . I can't remember how explicitly she complained it. But it was more like, I don't know, one of them looked better than the other at the same age." (UMF 148.) In 2012, 2013 or 2014, Dr. Guirguis told a dental assistant Laura Wallace that, "If you haven't gotten married by now, you are pretty much done." (UMF 150.) Ms. Wallace reported this to Plaintiff at the time the statement was made. (UMF 151)

## I.     Plaintiff's DFEH Complaints

Plaintiff filed her first Department of Fair Employment and Housing complaint on January 20, 2018 (UMF 164) alleging gender discrimination against Dr. Guirguis relating to issues discussed herein (Sidhu Decl. ¶ 12). Subsequently, a charge was signed on or about February 20, 2018 and mailed to the defendants. (Sidhu Decl. ¶ 12.) Plaintiff filed a second DFEH complaint on January 19, 2020. (UMF 165.)

Plaintiff's complaint was filed on June 13, 2019, in the Los Angeles Superior Court. (Doc. 18-1 at 19.) Because the complaint contains a cause of action brought under 42 U.S.C. § 1983, Defendant removed the case to this Court on July 19, 2020. (Doc. 18-1 at 19; Doc. 1.)

## II.     Legal Standards for Summary Judgment

The "purpose of summary judgment is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsuhita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986) (citation omitted).  Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  In addition, Rule 56 allows a court to grant summary adjudication, or partial summary judgment, when there is no genuine issue of material fact as to a particular claim or portion of that claim. Fed. R. Civ. P. 56(a); *see also Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 769 n.3 (9th Cir. 1981) ("Rule 56 authorizes a summary adjudication that will often fall short of a final determination, even of a single claim . . .") (internal quotation marks and citation omitted).  The standards that apply on a motion for summary judgment and a motion for summary adjudication are the same.  *See* Fed. R. Civ. P. 56 (a), (c); *Mora v. Chem-Tronics,* 16 F. Supp. 2d 1192, 1200 (S.D. Cal. 1998).

Summary judgment, or summary adjudication, should be entered "after adequate time for

discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The moving party bears the "initial responsibility" of demonstrating the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  An issue of fact is genuine only if there is sufficient evidence for a reasonable fact finder to find for the non-moving party, while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Wool v. Tandem Computers, Inc.*, 818 F.2d 1422, 1436 (9th Cir. 1987).  A party demonstrates summary adjudication is appropriate by "informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323 (quoting Fed. R. Civ. P. 56(c)).

If the moving party meets its initial burden, the burden then shifts to the opposing party to present specific facts that show there is a genuine issue of a material fact.  Fed R. Civ. P. 56(e); *Matsuhita*, 475 U.S. at 586.  An opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 587.  The party is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that a factual dispute exits.  *Id.* at 586 n.11; Fed. R. Civ. P. 56(c).  The opposing party is not required to establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." *T.W. Electrical Serv., Inc. v. Pacific Elec. Contractors Assoc.*, 809 F.2d 626, 630 (9th Cir. 1987).  However, "failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323.

The Court must apply standards consistent with Rule 56 to determine whether the moving party demonstrated there is no genuine issue of material fact and judgment is appropriate as a matter of law.  *Henry v. Gill Indus., Inc.*, 983 F.2d 943, 950 (9th Cir. 1993).  In resolving a motion for summary judgment, the Court can only consider admissible evidence.  *Orr v. Bank of America, NT & SA,* 285 F.3d 764, 773 (9th Cir. 2002) (citing Fed. R. Civ. P. 56(e); *Beyene v. Coleman Sec. Servs., Inc.*, 854

1  F.2d 1179, 1181 (9th Cir. 1988)).  Further, evidence must be viewed "in the light most favorable to the

2  nonmoving party" and "all justifiable inferences" must be drawn in favor of the nonmoving party. *Orr*,

3  285 F.3d at 772; *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000).

4         California's Fair Employment and Housing Act affords state employees protection against

5  discrimination and retaliation on any of a wide range of impermissible bases. *McDonald v. Antelope*

6  *Valley Community College Dist.*, 45 Cal.4th 88, 105 (2008). Due to the similarity between federal and

7  state employment discrimination laws, "California has adopted the three-stage burden-shifting test

8  established by the United States Supreme Court for trying claims of discrimination . . . based on a

9  theory of disparate treatment." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 354 (2000) (emphasis in

10  original) (noting California courts' reliance on the federal burden shifting test articulated in *McDonnell*

11  *Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Likewise, the shifting burden test applies to claims of

12  retaliation under FEHA. *See Winarto v. Toshiba America Electronics Components, Inc.*, 274 F.3d

13  1276, 1284 (9th Cir. 2001).

14         In general, the plaintiff bears the burden to establish a prima facie case of a violation of

15  the FEHA. *McDonnell Douglas Corp.*, 411 U.S. at 802. "The burden of establishing a prima facie case

16  . . . is not onerous," and the evidence may be either direct or circumstantial. *Texas Dep't of Cmty.*

17  *Affairs v. Burdine*, 450 U.S. 248, 253 (1981); *see also DeJung v. Superior* Court, 169 Cal. App. 4th

18  533, 549 (2008) (noting evidence may be direct or circumstantial). If a plaintiff establishes a prima

19  facie case, "the burden of production, but not persuasion, then shifts to the [defendant] to articulate

20  some legitimate, nondiscriminatory reason for the challenged action." *Hawn v. Executive Jet Mgmt.,*

21  *Inc.*, 615 F.3d 1151, 1155 (9th Cir. 2010) (explaining the burden as it related to a claim for

22  discrimination under federal law); *see also McDonnell Douglas Corp*, 411 U.S. at 803. If the

23  defendant carries this burden, the inquiry does not end. Rather, the burden shifts back to the plaintiff to

24  demonstrate the reasons proffered by defendant are pretextual. *McDonnell Douglas Corp.*, 411 U.S. at

25  805. Consequently, the plaintiff has "the ultimate burden of persuading the trier of fact that the

26  defendant intentionally discriminated against [him]." *Reeves v. Sanderson Plumbing Products,*

27  *Inc.* 530 U.S. 133, 142 (2000).

28         Notably, however, when an employer moves for summary judgment on a FEHA claim, "'the

10

1   burden is reversed . . . because the defendant who seeks summary judgment bears the initial

2   burden.'" *Dep't of Fair Emp't & Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 745 (9th Cir. 2011)

3   (quoting *Hanson v. Lucky Stores, Inc.*, 74 Cal. App. 4th 215, 224 (1999)); *see also Martin v. Lockheed*

4   *Missiles & Space Co.*, 29 Cal. App. 4th 1718, 1730 (1994) ("A defendant seeking summary judgment

5   must bear the initial burden of showing that the action has no merit, and the plaintiff will not be

6   required to respond unless and until the defendant has borne that burden").

7   **III.    Evidence before the Court**

8          In evaluating a motion for summary judgment, the Court examines the evidence provided by the

9   parties, including pleadings, deposition testimony, answers to interrogatories, and admissions on file.

10  *See* Fed. R. Civ. P. 56(c). On a motion for summary judgment, "[a] party may object that the material

11  cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

12  Fed. R. Civ. P. 56(c)(2). The Court has reviewed each of the evidentiary objections identified by the

13  Defendants related to the opposition for summary judgment.  (*See* Doc. 26.)  However, the Court

14  declines to address each of the individual objections identified. *See Capitol Records, LLC v. BlueBeat,*

15  *Inc.*, 765 F. Supp. 2d 1198, 1200 n.1 (C.D. Cal. 2010) (observing "it is often unnecessary and

16  impractical for a court to methodically scrutinize each objection and give a full analysis of each

17  argument raised").

18         To the extent Defendants object to evidence on the grounds of relevance, such objections are

19  inappropriate, because the Court must determine whether a fact is relevant and material as part of "the

20  summary judgment standard itself." *Burch v. Regents of the Univ. of Cal*., 433 F.Supp. 2d 1110, 1119

21  (E.D. Cal. 2006).  Toward that end, any evidence deemed irrelevant was omitted from the Court's

22  summary of the facts and contentions above.  Further, the Court, as a matter of course, has not factored

23  into its analysis any statements identified by either party that are speculative or represent a legal

24  conclusion. *See Burch*, 433 F. Supp.2d at 1119 ("statements in declarations based on speculation or

25  improper legal conclusions, or argumentative statements, are not *facts* and likewise will not be

26  considered on a motion for summary judgment") (citation omitted, emphasis in original).  Thus, the

27  Court has relied upon only admissible evidence.  In addition, the Court will consider only those facts

28  that are supported by admissible evidence and to which there is no genuine dispute.

1  **IV.     Discussion and Analysis**

2       **A.     Gender Discrimination under FEHA**

3            Plaintiff alleges Defendants are liable for violations of FEHA. In particular, Plaintiff's FEHA,

4  gender discrimination claims are based on the allegations that (1) Dr. Guirguis refused to move

5  Plaintiff to a different location at Wasco allegedly in retaliation for filing an administrative complaint

6  with the Department of Fair Employment and Housing; (2) Dr. Guirguis imposed reporting

7  requirements on Plaintiff, requiring her to report to a supervisor when she would leave the office,

8  which were not required of other male dentists, and this created a hostile work environment; (3) Dr.

9  Guirguis chose male dentists instead of her to attend a computer training session at CDCR

10  headquarters that was superior to the subsequent training she attended at Wasco; and (4) Dr. Guirguis

11  imposed a new procedure in handling X-rays on the Plaintiff alone and not her male colleagues that

12  was more burdensome than that required of others.

13       **1.     Discrimination and Retaliation**

14            California's Fair Employment and Housing Act affords state employees protection against

15  discrimination and retaliation on any of a wide range of impermissible bases. *McDonald v. Antelope*

16  *Valley Community College Dist.*, 45 Cal.4th 88, 105 (2008).

17            California Government Code § 12940(h) makes it unlawful,

18            For any employer, labor organization, employment agency, or person to discharge, expel,
     or otherwise discriminate against any person because the person has opposed any
19            practices forbidden under this part or because the person has filed a complaint, testified,
     or assisted in any proceeding under this part.

20

21            Like claims brought under Title VII, claims for violations of FEHA involve shifting burdens as

22  set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *Guz v. Bechtal Nat'l*

23  *Inc.*, 24 Cal.4th 317, 354 (2000) ("Because of the similarity between state and federal employment

24  discrimination laws, California courts look to pertinent federal precedent when applying our own

25  statutes."). First, the plaintiff bears the burden to establish a prima facie case of employment

26  discrimination. *Id.* at 354. "While the plaintiff's prima facie burden is 'not onerous' [Citation], he

27  must at least show 'actions taken by the employer from which one can infer, if such actions remain

28  unexplained, that it is more likely than not that such actions were "based on a [prohibited]

discriminatory criterion . . .'" *Id*. at 355.

To establish a prima facie case for retaliation, a plaintiff must demonstrate "(1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). To do this, a plaintiff may rely upon a comparison with other similarly situated people or by demonstrating the other circumstances of the case that provide an inference that retaliation was the motive. *Hawn v. Executive Jet Mgmt., Inc.*, 615 F.3d 1151, 1156 (9th Cir. 2010).

If a plaintiff succeeds, the burden of production shifts to the defendant to present admissible evidence demonstrating a legitimate nonretaliatory reason for its actions. *Guz*, 24 Cal.4th at 355-56. If the defendant is successful, the presumption of discrimination falls away, and the burden shifts back to the plaintiff to demonstrate that the defendant's proffered reasons are pretexts for discrimination. *Id*. at 356. The plaintiff can establish pretext by "directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Aragon v. Republic Silver State Disposal Co.*, 292 F.3d 654, 658-59 (9th Cir. 2002). A pretext may be shown through "very little" direct evidence. *Little v. Windermere Relocation, Inc.*, 301 F.3d 958, 971 (9th Cir. 2002). On the other hand, where a plaintiff relies upon circumstantial evidence to demonstrate pretext, the evidence must be "specific" and "substantial" to create a triable issue. *Godwin v. Hunt Wesson Inc.*, 150 F.3d 1217, 1222 (9th Cir. 1998).

    a.    Discrimination – Transfer Denial

Plaintiff's claim for discrimination in violation of FEHA is based upon disparate treatment. Disparate treatment is "*intentional* discrimination against one or more persons on prohibited grounds." *Guz*, 24 Cal. 4th at 354 n.20 (emphasis in original). Prohibited discrimination based on disparate treatment occurs when an "employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." *Int'l Board of Teamsters v. United States*, 431 U.S. 324, 335-336, n.15 (1977). "Proof of discriminatory motive is critical, although it can in some situations be inferred from the mere fact of differences in treatment." *Id.*

13

Generally, to establish a prima facie case of discrimination under FEHA, a plaintiff must provide evidence that:

(1) he was a member of a protected class, (2) he was qualified for the position he sought or was performing competently in the position he held, (3) he suffered an adverse employment action, such as termination, demotion, or denial of an available job, and (4) some other circumstance suggests discriminatory motive.

*Guz*, 24 Cal. 4th at 355.

In May or June of 2017, Plaintiff requested to be assigned permanently to B Yard. Plaintiff had been working on B Yard, while Dr. Michaels was on leave. Dr. Guirguis refused the request because he said Dr. Michael might return. (Doc. 20 at 22; Sidhu Decl. ¶ 10.) In July 2017, Laura Wallace, a dental assistant, was assigned to B Yard. Ms. Wallace has had repeated conflicts with dentistry staff and this assignment proved no exception.  Substantial friction occurred between her and Plaintiff and when Plaintiff asked that Ms. Wallace be moved, Dr. Guirguis instead moved Plaintiff to the more onerous A Yard. (Doc. 20 at 22-23; Sidhu Decl. ¶ 10.) In the past, when other male dentists had conflicts with Ms. Wallace, Dr. Guirguis move Ms. Wallace. (Sidhu Decl. ¶ 10)

Plaintiff requested to be transferred back to B Yard in June 2018, upon discovering that Dr. Michael had retired and Ms. Wallace was no longer working in B Yard. (Doc. 20 at 23; Sidhu Decl. ¶ 10.) Dr. Guirguis denied this request because he had placed a new male dentist, Dr. Hoang, in that position. (Doc. 20 at 23; Sidhu Decl. ¶ 10.)

### i.    Member of a protected class

Notably, there is no stipulated fact or evidence in the record identified by the parties related to Plaintiff's sex or gender or status as a member of a protected class. However, both parties identify Plaintiff as a female. (*See* Doc. 18-1 at 7; Doc. 20 at 6.) Further, the Plaintiff asserts that "[t]here is little doubt Plaintiff is in a protected class." (Doc. 20 at 17-18, 25.)

### ii.   Plaintiff's performance in the position

The parties do not dispute that Plaintiff was performing competently in the position she held. Accordingly, for purposes of this motion, this element is satisfied.

### iii.   Adverse employment action

Although an adverse employment action must "materially affect the terms, conditions, or

14

privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim." *Yanowitz*, 36 Cal. 4th at 1051-1052. "[A] wide array of disadvantageous changes in the workplace constitute adverse employment actions." *Ray v. Henderson*, 217 F.3d 1234, 1241 (9th Cir. 2000).

Plaintiff alleges that the Plaintiff being kept in A Yard (which is considered by some to be the most difficult assignment at the prison) and not being moved to B Yard constitutes an adverse employment action. (Doc. 20 at 24.) Plaintiff claims she was discriminated against as she was treated less favorably than other male dentists by being given a more difficult and burdensome assignment. (Doc. 20 at 24-25.) Plaintiff alleges that the time it takes to finish all the work alone reveals that A Yard is more strenuous. (Doc. 20 at 24; Sidhu Decl. ¶ 10.) The greater burden imposed by A Yard is supported also by the fact that Plaintiff must train the inexperienced dental assistants that are assigned there. Id.

The denial of a transfer request and a transfer can constitute an adverse employment action. However "[a] change that is merely contrary to the employee's interests or not to the employee's liking is insufficient" to constitute an adverse employment action. *Light v. Dep't of Parks & Recreation*, 14 Cal. App. 5th 75, 92 (2017) (quoting *McRae v. Dep't of Corr. & Rehab.*, 142 Cal. App. 4th 377, 386 (2006) (omitting internal quotation marks)). In *McRae*, the California Court of Appeal held that "[a] transfer can be an adverse employment action when it results in substantial and tangible harm. A transfer is not an adverse employment action when it results in a comparable position that does not result in substantial and tangible harm. A transfer is not an adverse action simply because the plaintiff finds it to be 'personally humiliating.'" *McRae*, 142 Cal.App.4th at 393 (omitting internal citations). In reaching its conclusion, the Court of Appeal adopted a D.C. Circuit explication that it felt "reflects our own view":

> [A] plaintiff who is made to undertake or who is denied a lateral transfer — that is, one in which she suffers no diminution in pay or benefits — does not suffer an actionable injury unless there are some other materially adverse consequences . . . such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively tangible harm. Mere idiosyncrasies of personal preference are not sufficient to state an injury.

*Id.* (quoting *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)).

15

1    In *McRae*, the Court of Appeal rejected the contention that a location transfer was an adverse

2   employment action because the new location — the plaintiff asserted — "had a reputation among

3   physicians as one of the worst facilities in the system" because, other than her personal beliefs, the

4   plaintiff produced no evidence that it "in fact had a poor reputation". *Id.* at 393. However, here there is

5   a question of fact whether the assignment to A Yard constitutes a "comparable position" to work in as

6   B Yard.

7                        *iv.    Circumstance suggesting discriminatory motive*

8    Plaintiff identifies circumstances that suggest Dr. Guirguis had a discriminatory motive for

9   denying Plaintiff's request to move to B Yard, including that he did not inform Plaintiff when Dr.

10  Michael retired, which opened up the spot that Dr. Guirguis knew Plaintiff wanted. Then, despite this

11  knowledge, Dr. Guirguis placed a male new hire into the position. (Doc. 20 at 25.) Plaintiff also

12  describes that when an acting supervisor, Dr. Melissa Primus, became the supervisor in October 2020,

13  Plaintiff asked Dr. Primus to transfer to B Yard and she did so, by bumping the less senior employee.

14  (Doc. 20 at 23.) Viewing the facts in the light most favorable to Plaintiff, the Court finds that Plaintiff

15  provides sufficient evidence to raise a genuine question of disputed material fact with respect to this

16  claim.

17        b.    Retaliation

18    To establish a prima facie case for retaliation, a plaintiff must demonstrate "(1) he or she

19  engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment

20  action, and (3) a causal link existed between the protected activity and the employer's action."

21  *Yanowitz v. L'Oreal USA, Inc.*, 36 Cal. 4th 1028, 1042 (2005). To do this, a plaintiff may rely upon a

22  comparison with other similarly situated people or by demonstrating the other circumstances of the

23  case that provide an inference that retaliation was the motive. *Hawn v. Executive Jet Mgmt., Inc.*, 615

24  F.3d 1151, 1156 (9th Cir. 2010).

25                        *i.    Protected activity*

26    An employee, who opposes in good faith his employer's discrimination, has engaged in a

27  protected activity even if it turns out, ultimately, that the employer's perceived discriminatory conduct

28  was not unlawful. *Yanowitz*, 36 Cal.4th at 1043.

The evidence demonstrates that Plaintiff filed her first DFEH complaint on January 20, 2018 (UMF 164) alleging gender discrimination against Dr. Guirguis relating to issues discussed herein (Sidhu Decl. ¶ 12). Subsequently, a charge was signed on or about February 20, 2018 and mailed to the defendants. (Sidhu Decl. ¶ 12.) Defendants do not suggest that Plaintiff lacked a good faith belief that Defendants engaged in discrimination or retaliation when she filed her complaints. Likewise, they do not dispute that they were aware of the statements. Thus, the action is protected by FEHA. *Yanowitz*, 36 Cal.4th at 1043.

       *ii.*    *Causal link*

The requisite causal link between protected activity and an adverse employment action may be "inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1375 (9th Cir. 1987). "Causation sufficient to establish the third element of the prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Id*. at 1376.

In June 2018, Plaintiff requested to be transferred to B Yard, but Dr. Guirguis (who was aware from a prior request by Plaintiff that she wanted to be transferred there) denied this request. (Doc. 20 at 27.) Given the short period of time between the filing of the complaint and the denial of the transfer request, a causal link may be inferred between Plaintiff's protected activity and the adverse employment action. *See, e.g., Yartzoff*, 809 F.2d at 1376 (inferring causation where adverse employment actions took place less than three months after the plaintiff's complaint where his supervisors were aware of his Title VII charges and his participation in administrative investigations); *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 869-70 (9th Cir. 1996) (finding causal link where alleged retaliation followed within months of protected activity where supervisor knew of the employee's complaint).

    c.    Defendants' legitimate, non-discriminatory reasons

Defendants contend that the location refusal was not gender discrimination by Dr. Guirguis because it was based on policy, and the decision was made by CEO Hill. (Doc. 18-1 at 25.) However,

17

Plaintiff claims that Hill did not make the decision not to place Plaintiff in B Yard permanently, Dr. Guirguis did, and Hill only responded to a grievance. (Doc. 20 at 23.) Defendants also assert that Plaintiff's 2018 request to move to B Yard was denied because there was no vacant position in B Yard at that time, and a dentist cannot "bump" another dentist out of that dentist's spot. (Doc. 18-1 at 25; Doc. 25 at 14.) Though there appears to be a question of fact regarding who decided whether to place Plaintiff in B Yard, Defendants have met their burden of production.

      d.     Pretext

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, (1981); *see also Coghlan v. Am. Seafoods Co.*, 413 F.3d 1090, 1094-95 (9th Cir. 2005). Direct evidence typically consists of retaliatory statements or actions by the employer. *Coghlan*, 413 F.3d at 1095. Indirect evidence "requires an additional inferential step" to establish retaliation. *Id.*

Dr. Guirguis was fully aware of Plaintiff's desire to be moved to B Yard, and upon initially denying her request because Dr. Michael was already in that position, even when Dr. Michael retired, Dr. Guirguis failed to inform Plaintiff about the opening in B Yard. Dr. Guirguis then proceeded to fill the position with a male new hire, Dr. Hoang. Moreover, the evidence that Dr. Primus bumped the less senior employee to place Plaintiff, the more senior employee, in that spot is evidence that Defendant's explanation that the policy of the prison does not involve seniority, is pretextual. (Doc. 20 at 25.) This raises a question of fact (See Doc. 20 at 24), and when the evidence is taken most favorably to Plaintiff, there is a sufficient inference that Dr. Guirguis' actions of not moving Plaintiff to B Yard were motivated by a discriminatory reason, or that Defendants' proffered explanation is unworthy of credence. *See Texas Dep't of Cmty. Affairs*, 450 U.S. at 256.

      **2.**     **Discrimination and Hostile Work Environment – Reporting Requirement**

Plaintiff's claim for discrimination in violation of FEHA is based upon disparate treatment regarding a reporting requirement imposed on her. This claim is based upon Dr. Guirguis demanding that Plaintiff report to him whenever she leaves her assigned area. (Doc. 20 at 11.) The Plaintiff claims that although this reporting requirement is a rule that applied to all dentists, Dr. Guirguis only applied

it and enforced it against females. (Doc. 20 at 11.) Plaintiff also claims that such a requirement of constant reporting to her supervisor creates a hostile work environment. (Doc. 20 at 12.)

a.      Adverse employment action

Plaintiff argues that Dr. Guirguis enforced a policy that required dentists to contact a supervisor when they leave the office only against the females (Doc. 20 at 11-12.)  Though the evidence shows generally that the male dentists reported when they left their duty stations (Doc. 18-1 at 21-22; Doc. 25 at 6), there is no showing that this happened invariably or, if it did not, that they suffered any consequence as a result. Thus, it does not address whether the policy was *enforced* only against females. (Doc. 20 at 11-12.) Though Plaintiff does not purport to know of every communication between the male dentists and Dr. Guirguis, Plaintiff attests that Dr. Guirguis told Plaintiff explicitly that the reporting requirement applied only to females (UMF 14) and reiterated this when meeting with plaintiff, the union rep and the EEO Officer. (Sidhu Decl. ¶ 6) The fact that others do not recall this statement or that another employee asserts that the statement was not made, does not change that there exists a dispute in the evidence. In viewing the facts most favorably to Plaintiff, the Court finds there is a genuine question of disputed material fact whether the reporting requirement was enforced against only females.

b.      Hostile work environment

"A hostile work environment claim involves a workplace atmosphere so discriminatory and abusive that it unreasonably interferes with the job performance of those harassed." *Brooks v. City of San Mateo*, 229 F.3d 917, 923 (9th Cir. 2000). "A hostile work environment occurs when an employee 1) 'was subjected to verbal or physical conduct of a sexual nature, 2) this conduct was unwelcome, and 3) this conduct was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Fuller v. Idaho Department of Corrections*, 865 F.3d 1154, 1161 (9th Cir. 2017) (quoting *Fuller v. City of Oakland*, 47 F.3d 1522, 1527 (9th Cir. 1995)).

"Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's

work performance.'" *Clark County School Dist. v. Breeden*, 532 U.S. 268, 270-71 (2001)

(quoting *Faragher v. Boca Raton*, 524 U.S. 775, 787-788 (1998)). "The working environment must

both subjectively and objectively be perceived as abusive." *Fuller*, 47 F.3d at 1527. "[T]he objective

severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's

position[.]" *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998).

There is no dispute that under FEHA Plaintiff qualifies as a member of a protected group

because she is a female. The Court also assumes without deciding that she was subject to inappropriate

comments based on her gender, rather than other characteristics. The primary dispute is whether the

actions and comments Plaintiff alleges rise to the level of creating a hostile work environment.

"[O]nly behavior so objectively offensive as to alter the 'conditions' of the victim's

employment" creates a hostile work environment. *Lyle v. Warner Bros. Television Prods.*, 132 P.3d

211, 222 (Cal. 2006). A hostile work environment is one that "is permeated with 'discriminatory

intimidation, ridicule, and insult,' that is 'sufficiently severe or pervasive to alter the conditions of the

victim's employment and create an abusive working environment.'" *Harris v. Forklift Sys., Inc.*, 510

U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986)) (internal

citations omitted). Whether a work environment is hostile is determined by looking at the totality of

the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is

physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

interferes with an employee's work performance." *Id*. at 23. "The working environment must both

subjectively and objectively be perceived as abusive." *Fuller v. City of Oakland*, 47 F.3d 1522, 1527

(9th Cir. 1995), *as amended* (Apr. 24, 1995).

Annoying or merely offensive comments in the workplace are not actionable. *Lyle*, 132 P.3d at

223. A plaintiff must show a "concerted pattern of harassment of a repeated, routine or a generalized

nature." *Lawler v. Montblanc N. Am., LLC*, 704 F.3d 1235, 1244 (9th Cir. 2013) (quoting *Aguilar v.

Avis Rent A Car Sys., Inc.*, 980 P. 2d 846, 851 (Cal. 1999)). "Isolated incidents that do not exist in a

concerted pattern can also fulfill the 'severe or pervasive' prong, but only if such isolated incidents

consist of 'a physical assault or the threat thereof.'" *Landucci v. State Farm Ins. Co.*, 65 F. Supp. 3d

694, 703-04 (N.D. Cal. 2014) (quoting *Hughes v. Pair*, 209 P.3d 963, 974-75 (Cal. 2009)).

Plaintiff contends that, among other things, the constant reporting to her supervisor contributed to creating a hostile work environment. (Doc. 20 at 12-14.) Unlike her colleagues, the Plaintiff must leave her work area up to five times per day, which means that she would have to contact Dr. Guirguis twenty times each week when she leaves her office. (Sidhu Decl. ¶ 6.) Thus, the reporting requirement places a burden on her that her male colleagues do not suffer. (Sidhu Decl. ¶ 6.) Being required to report her whereabouts only because she is a female is "demeaning and clearly intended so." (Doc. 20 at 14.) Plaintiff further alleges that it appears that Dr. Guirguis intended to assert his authority over the Plaintiff by enforcing this rule only as to her to further show his dominion and control over her as a female. (Doc. 20 at 14.) Similarly, Plaintiff being required to work at A Yard (which is considered by some to be the most difficult assignment at the prison) when she wanted to be placed in B Yard (which request was denied by Dr. Guirguis), contributed to the hostile work environment Plaintiff was experiencing. (Doc. 20 at 24.)

In relation to this claim, Plaintiff sets forth various instances of Dr. Guirguis making inappropriate comments. For example, Plaintiff alleges that Dr. Rynders was feeling hot, and Dr. Guirguis said to Dr. Rynders (a male dentist), "Are you going through menopause." (UMF 131.) Plaintiff claims Dr. Guirguis "kinda looked towards our direction, and then he said – he said, 'Right? You would understand that, right?'" (Sidhu Depo. 108: 19-24.) Plaintiff took that to mean Dr. Guirguis was saying she was going through menopause. (UMF 133.) On another occasion, in 2012, Dr. Guirguis (who is from Egypt) said, "If she doesn't want to come to work I can't drag her by her hair and bring her to work. This is not Egypt." (Doc. 18-1 at 17; Sidhu Depo. 182:3-24.) This comment was made to Plaintiff, about Dr. Aziz, another female dentist. (UMF 137.) In another instance, Dr. Guirguis, addressing a female employee who had resigned, stated that "women with husbands making good money should not work." (Doc. 18-1 at 18; Sidhu Depo. 186: 6-24.) Dr. Guirguis had been in contact with Dr. Aziz and said that "she was now happy . . . she takes care of herself, and she—you know, I always see her with makeup, and she's doing good." (Sidhu Depo. 186:25-187:3.) Plaintiff also thinks that Dr. Guirguis supposedly compared the physiques of women in 2016 or 2017, which she heard from a third party. (UMF 147; UMF 148.) On yet another occasion, Plaintiff alleges that Dr. Guirguis told a female employee, "If you haven't gotten married by now, you

are pretty much done." (UMF 150.) Also, at a meeting, Dr. Guirguis asked Plaintiff if she needed to see a shrink because she is a female and females are more vulnerable. (Doc. 20 at 6; Rahman Depo. 12:9-25; Lewis Decl. ¶ 2.)

Although it appears the isolated and offensive comments would not amount to creating a hostile work environment under the standard, when coupled with Plaintiff's other allegations of discrimination, including the requirement of constant reporting to her supervisor imposed only upon Plaintiff, it becomes a closer call. Thus, accepting the Plaintiff's allegations as true, the Court finds that Plaintiff's allegations and evidence concerning Dr. Guirguis' behavior create a question of fact as to whether this conduct was sufficiently severe or pervasive to alter the conditions of the Plaintiff's employment to create a hostile working environment. Compare *Manatt v. Bank of America, NA*, 339 F.3d 792, 798 (9th Cir. 2003) (no hostile work environment where "only a couple of occasions did Manatt's co-workers or supervisor direct their racially insensitive 'humor' at Manatt."); *Kortan v. Cal. Youth Auth.*, 217 F.3d 1104, 1111 (9th Cir. 2000) (finding no hostile work environment where the supervisor referred to females as "castrating bitches," "Madonnas," or "Regina" in front of plaintiff on several occasions and directly called plaintiff "Medea"); with *Nichols v. Azteca Rest. Enters.*, 256 F.3d 864, 872-73 (9th Cir. 2001) (hostile work environment where male employee was called "faggot" and "fucking female whore" by co-workers and supervisors up to several times per day); *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999) (hostile work environment where a supervisor repeatedly referred to the employee as "office sex goddess," "sexy," and "the good little girl," drew a pair of breasts on an easel while the employee was making a presentation and said "this is your training bra session," employee received vulgar notes, was patted on the buttocks, and told she was "putting on weight down there"); *Draper v. Coeur Rochester*, 147 F.3d 1104, 1109 (9th Cir. 1998) (finding hostile work environment where supervisor made repeated sexual remarks, told plaintiff of his desire to have sex with her, commented on her appearance, and asked over a loudspeaker if she needed help changing her clothes). Accordingly, the motion for summary judgment is DENIED as to claims of a hostile work environment.

///

///

22

1

### 3.      Discrimination – Training Denial

2

#### a.      Discrimination

3

"[E]xclu[sion] from meetings, seminars and positions that would have made [the employee]

4

eligible for salary increases" may qualify as an adverse employment action. *See Ray v. Henderson*,

5

217 F.3d 1234, 1241 (9th Cir. 2000) (citing *Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859,

6

869 (9th Cir. 1996)). Plaintiff alleges that she was denied the opportunity to attend CERNR data-

7

management training seminar in Sacramento in August 2017, which was to train "super-users." (UMF

8

34; Doc. 20 at 16.) A super-user is a user who is more knowledgeable and has the authority to train the

9

other dentists (UMF 35), which is important for a dentist that wants to apply for a promotion (Sidhu

10

Decl. ¶ 7). Although the similar CERNR training was offered to dentists at Wasco later in the year and

11

Plaintiff was able to attend it (UMF 42), the earlier, "super-users" training provided superior training

12

and opportunities. As described, those that attended the training session in Sacramento became super-

13

users, with skills and authority to train others, whereas the training session offered later in the year did

14

not.

15

Attendance at the training in Sacramento also provided networking opportunities with

16

personnel high up in the department. (Sidhu Decl. ¶ 7.) Making these contacts improved the attendees'

17

chances of promotions in the future. (Sidhu Decl. ¶ 7.) Thus, Plaintiff has raised a dispute of fact as to

18

whether there were material differences in receiving the CERNR data-management training in

19

Sacramento in August 2017 or the training that was offered to dentists at Wasco later in the year.

20

#### b.      Defendant's legitimate, nondiscriminatory reasons

21

Dr. Guirguis selected Dr. Seitz and Dr. Jang, two male dentists, to attend the training in

22

Sacramento. (UMF 36.) To establish a legitimate, nondiscriminatory reason for Plaintiff not being

23

selected for the "super users" training, Defendants contend that the evidence shows that Dr. Guirguis

24

selected these dentists based on their experience and knowledge, rather than based on their gender.

25

(Doc. 18-1 at 23.) Although Plaintiff does not know to whom the training was offered and why these

26

dentists were selected, Dr. Guirguis did not inquire of her about her own computer training or

27

computer skills. (Sidhu Decl. ¶ 7.)

28

///

c.      Pretext

Plaintiff argues that the excuse that the males were observed to have better computer skills is not worthy of credence. (Doc. 20 at 18.) Dr. Guirguis' explanation is not tenable because he cannot identify what he observed that caused him to believe that the male dentists he chose had better computer skills than Plaintiff. (Doc. 20 at 18.) Furthermore, Dr. Guirguis never inquired about the extent of Plaintiff's computer skills or computer training. (Doc. 20 at 18; Sidhu Decl. ¶ 7.) Plaintiff cites to cases from various courts to support her contention that failure to investigate is evidence of pretext. *See*, *e.g.*, *Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1073 (M.D. Tenn. 2000) (lack of adequate investigation including talking to plaintiff was evidence of pretext). Moreover, according to Plaintiff, there have been other training seminars for dentists from her office to attend, including other computer training, which occurred in 2017 and 2018, and she was never chosen for any of those, but male dentists were chosen. (Sidhu Decl. ¶ 7.)

Under these circumstances, the Court concludes that Plaintiff has raised a genuine question of disputed material fact with respect to the selection process that was implemented for the training seminar and whether there were material differences between the super-user training and the one Plaintiff was allowed to attend later, precluding summary judgment on this issue.

**4.      Discrimination – X-Ray Procedure**

Plaintiff contends that Dr. Guirguis subjected her to a computer policy, described in detail above, when handling X-rays that was onerous and unnecessary and was not imposed on her male colleagues. (Doc. 20 at 20-21.) Considering that such a policy was imposed on only Plaintiff and not her male colleagues, and it made handling X-rays more onerous and impaired her ability to do her job, Plaintiff meets her burden of establishing a prima facie case in violation of FEHA.

Defendants claim that this policy was one that was to be generally followed by all dentists, and the policy of not using each other's log in was a universal policy. (Doc. 18-1 at 24.) However, Plaintiff observes that the e-mail mandating that Plaintiff use this policy was not sent to others. (Doc. 20 at 20.) Although the e-mail correspondence took place in the context of a dispute that arose between Plaintiff and Ms. Wallace, Plaintiff maintains that she never received an e-mail to all the dentists indicating that this new procedure would be used, and she was never informed by Dr. Guirguis during any meetings

24

1   with all the dentists that this was the new procedure to be followed going forward. (Sidhu Decl. ¶ 9.)

2   Viewing the evidence in the light most favorable to Plaintiff, the Court finds there is a genuine dispute

3   as to whether the X-ray procedure at issue applied to all dentists or just to Plaintiff such that summary

4   judgment is not appropriate on this issue.

5   **B.    Failure to Prevent Discrimination under FEHA**

6          It is unlawful under FEHA for an employer "to fail to take all reasonable steps necessary to

7   prevent discrimination and harassment from occurring." Cal. Govt. Code. § 12940(k). A plaintiff

8   seeking to recover damages based on this claim must show that "(1) plaintiff was subjected to

9   discrimination, harassment, or retaliation; (2) defendant failed to take all reasonable steps to prevent

10  discrimination, harassment or retaliation; and (3) this failure caused plaintiff to suffer injury, damage,

11  loss or harm." *Leland v. City & Cty. of San Francisco*, 576 F. Supp. 2d 1079, 1103 (N.D. Cal. 2008).

12  If plaintiff has established sufficient evidence to overcome summary judgment with respect to a

13  disparate treatment or retaliation claim under FEHA, defendant is not entitled to summary judgment

14  on a failure to prevent discrimination claim. *Id.*; *see also Reed v. First Student, Inc.*, No. CV 16-5483-

15  RSWL-FFMX 2017 WL 4325580, at *6 (C D. Cal. Sept. 27, 2017) ("This claim essentially derives

16  from a FEHA discrimination claim. Because Plaintiff's FEHA cause of action survives summary

17  judgment, the Court denies Defendant's Motion as to Plaintiff's failure to prevent discrimination cause

18  of action as well.") (internal citations omitted). Plaintiff's FEHA discrimination and retaliation claims

19  survive summary judgment. Thus, the Court denies the motion for summary judgment as to the failure

20  to prevent discrimination claim.

21  ///

22  ///

23  ///

24  ///

25

26  **V.    Conclusion and Order**

27         Based upon the foregoing, the Court **ORDERS** that Defendants' motion for summary

28  judgment/summary adjudication (Doc. 18) is **DENIED**.

IT IS SO ORDERED.

Dated:   **February 5, 2021**                            **/s/ Jennifer L. Thurston**
UNITED STATES MAGISTRATE JUDGE